JUSTICE TRIEWEILER
concurring.
¶121 Frankly, I do not understand the point of Justice Leaphart’s concurring opinion and write separately to caution the parties and the District Court from attaching too much significance to it. To do so would only lead to further error, expense and delay before finally resolving this decade-long dispute on the merits.
¶122 First, Justice Leaphart points out that the parties have not raised quasi-judicial immunity. Then he claims he has no opinion about its application. One would assume that would be the end of the discussion. However, as if the facts in this case cry out for some defense, he then proceeds to brief that issue for the parties and tout the policy considerations behind it.
¶123 Having read the entire record, including the testimony of the Defendants, I can assure the parties that, Justice Leaphart’s unsolicited coaching aside, there is no factual nor legal basis for the application of quasi-judicial immunity to this case. To test those waters would only lead to further error, further appeal and further delay. Considering the Defendants’ representations at oral argument about the hardship that protraction of this case has caused them, that would not seem to be in anyone’s best interests.
¶124 It is also necessary to respond to the dissent of Justice Rice. Justice Rice concludes that statutory immunity is applicable because Deputy Sheriffs Ames and Caraway acted under “authority of law” when they entered Dorwart’s house. We, of course, have previously concluded that there was no statute, court order or prior decision of this Court which granted that authority. However, Justice Rice concludes that the combination of our 1902 decision in Ramsey v. Burns (1902), 27 Mont. 154, 69 P. 711, and Justice of the Peace Marilyn Kober’s command to “enter the residence” were the “authority of law” necessary to satisfy the statute. The problem with Justice Rice’s analysis is threefold. First, neither Ames nor Caraway ever heard of Ramsey. Second, Judge Kober did not tell either officer to enter or search Dorwart’s home. Third, Ramsey has not been “declared invalid as in conflict with the Constitution of Montana or the Constitution of the United States.”
*36 ¶125 Justice Rice’s opinion quotes at length from the testimony of Deputy Sheriff Paul Caraway. However, the quoted portion of Caraway’s testimony is out of context and for purposes of statutory or quasi-judicial immunity, the most critical portion is omittéd. When asked what authority he had to enter Dorwart’s house, Caraway gave the following answer:
A. I guess it would be two answers to that. The first would be an order from Judge Kober, and the second would be Mr. Dorwart’s, the conversation with him that we had while downstairs in the Sheriffs Office to enter through the back door due to the fact that it wasn’t locked, and to make sure that we used the back sliding, I believe it was a sliding glass door.
¶126 However, when referring to Judge Kober’s “order,” counsel for Dorwart clarified that what he was referring to were the writs of execution that had been issued. The following question and answer are in the record:
Q. And when you say “order”, do you mean by that the two Writs of Execution that you all were given?
A. Yes, sir.
Q. There was not any separate order?
A. No, sir, there was-to my knowledge, there was two executions.
Q. You would agree with me, wouldn’t you, that the writs do not state that you are to enter a residence and search it?
A. If you’re looking for those specific words in the writ, I don’t believe that was exactly specified in the writ itself.
¶127 The only conversation he recalled having with Justice of the Peace Kober was the one referred to by Justice Rice during which she told him to go to the house and take certain property. However, he did not testify that Justice of the Peace Kober advised him to enter and search the house. On the contrary, when asked the specific question, he gave the following answer:
Q. Did the subject of entering the house and searching it, was that specifically discussed with her?
A. With me, other than what I told you where she said go to the house and take the items-
Q. Okay.
A. -that was the extent of my conversation.
¶128 Furthermore, Caraway admitted that he knew the law prohibited entering a person’s house without permission or a warrant or exigent circumstances and conceded that an oral conversation with a judge would not be sufficient to authorize entry into a home. He gave the following testimony:
*37 Q. But you do agree with me that a court cannot orally authorize entry into a home, under any circumstances?
A. An oral conversation by itself, I don’t believe would be enough.
¶129 Neither did Deputy Sheriff Danny Ames rely on a verbal order from Justice of the Peace Kober to enter Dorwart’s house. He simply testified that he believed he was authorized to enter pursuant to the writ because the writ authorized him to seize property. However, he was aware that there was no express authorization in the writ to enter the house. His only other excuse for entering the house was his conversation with Dorwart. However, here is how he characterized that conversation:
Q. Do you remember what you said to him?
A. He was back in the jail, and I held up the writs, told him that I had them. I asked him if he had the money in order to pay the writs, I forget the amount, it was over $1000. He said he didn’t. I told him that I was going to have to go to his residence ánd seize the property.
During the conversation, he told me to go ahead and use the back door because you didn’t need a key to get in the back door.
Q. He said that after you told him you were going to have to go there to seize the property?
A. Told him we were going to have to seize some property.
Q. Did you tell him you were going to have to go in the house to seize some property?
A. I would imagine I did, because he told me that use the back door.
Q. Okay.
And you were holding up the writs when you said that?
A. Yes, I showed him the writs.
Q. Did you explain to him that you had to seize property because of these writs, or do you remember if you said anything about it?
A. I believe that’s what I said, as if he didn’t have the money, then I had the court orders, and that according to the court orders, if he couldn’t pay for them, that I had to seize the property to be sold in order to justify-or pay the writs off.
Q. And then tell me again, as best you can remember, what he said back? I know you have answered this once, but I-
A. Sure. I don’t know the entire conversation. I do know that it was, you know, use the back door, you don’t need a key to get in the book [sic] door. Something was said about the side door being locked, and then also he said something about be careful, he had a cat in the residence at the time, make sure'that we didn’t let the *38 cat out.
¶130 Ames conceded that he primarily inferred permission from Dorwart because when he told him he needed to go to his house and seize his property and had writs authorizing him to do so, he did not specifically object to him doing so.
¶131 Caraway admitted that he had no separate conversation with Dorwart and he admitted that neither he nor Ames asked Dorwart for permission or consent to enter the home and search it. He testified:
Q. Neither you or Danny asked Russ for his permission or consent to go in the home and search it; is that right?
A. Specifically, no.
Q. And it was at least implied to Russ that the Writ of Execution-that under the Writ of Execution, you all were going to go into the house and seize property, period?
A. Dan specifically told him we will have to execute this writ and seize property-
Q. Right.
A. -to satisfy this judgment.
¶132 As far as the conversation with Justice of the Peace Marilyn Kober, Danny Ames testified:
Q. Before you and Paul went out to Russ’ house on April 11th, ‘91, did you have, yourself have any conversations with Justice of the Peace Marilyn Kober about this?
A. There was a conversation that went on, I believe it was between Sgt. Caraway, Paul Caraway and the judge, and I was there. I don’t remember any of the conversation. I vaguely remember a conversation, but I couldn’t tell you what the conversation was about.
¶133 Therefore, two people directly involved in the entry of and search of Dorwart’s home have either testified that they were given no specific direction by Justice of the Peace Kober to enter and search the home or do not remember the conversation with Kober at all. This is hardly a basis for statutorily immunizing someone who violated a fundamental right under the constitutions of Montana and the United States.
¶134 Nor is the persistent effort to find shelter in Ramsey persuasive. When asked the following question, Caraway gave the following answer:
Q. Prior to going into Russ Dorwart’s home on April 11th, whatever it was, April of‘91, had anyone told you that Montana law authorized entry into a home and search and seize property under a Writ of Execution?
*39 A. Specifically in those words, I can’t-it’s hard to answer yes or no. I know I had been told under Montana law that you have to follow the orders of a judge; that you’re obligated to follow the orders of a judge.
I guess when you word it like you worded it, the answer-I don’t have an answer for that. I mean, I can’t say specifically that they had told me that.
¶135 Ames testified as follows:
Q. And no one had ever said that the law in Montana allows you to do this, to go into a home under a Writ of Execution?
A. I guess I would-I would-I can’t really say that anybody ever said those specific words.
¶136 In fact, Ames clearly testified that his reliance was only on the writ and what he inferred was Dorwart’s permission to enter his house. He stated:
Q. Other than your position that you had consent and your belief that the writs themselves authorized you to go in the house, do you believe there was any other basis to go in the home and search it?
A. With those two that you just got done telling me, no.
¶137 All of this testimony brings us back to the original point made in the majority Opinion. There was no statute authorizing Caraway and Ames to enter Dorwart’s home. There was no decisional law which allowed an invasion of his privacy pursuant to a writ of execution. The writ of execution itself did not authorize entry into and search of Dorwart’s home and neither did anything that was said by Justice of the Peace Kober. Therefore, there simply was no basis for the application of statutory immunity.
¶138 It is clear from the entire context of the deputies’ testimony that they have justified their entry into and search of Dorwart’s home and seizure of his exempt property for two reasons. First, they contend the writs authorized them to do so. However, we have now held twice that they did not. Second, they contend that Dorwart gave them permission to enter and search his home. However, it is clear that he did not. He was never even asked for his permission.
¶139 To suggest that somewhere in this series of uninformed mistakes, there lies a defense such as quasi-judicial or statutory immunity is a disservice to the Defendants, those who are advocating on their behalf, and law enforcement in general who will surely repeat the Defendants’ mistakes if encouraged to do so based on misinformation.
*40 ¶140 While none of the above is appropriately included in the official Opinion of the Court, I do conclude it was necessary to clarify the record and respond to the suggestions of Justices Leaphart and Rice.